OPINION OF THE COURT
 

 Graffeo, J.
 

 In this case, we address whether a New York criminal court exceeded the bounds of territorial jurisdiction conferred under Criminal Procedure Law 20.20. For the reasons that follow, we find that defendant was properly prosecuted in New York for attempted possession of a controlled substance in the first degree based on the significant conduct that occurred in this State for an attempt offense effectuated when defendant and his accomplices were offered heroin and tested samples of the narcotic in a neighboring State.
 

 At trial, the People offered evidence that defendant was a member of a conspiracy to procure heroin for sale in New York and that defendant and his accomplices were guilty of attempted criminal possession of a controlled substance based on a series of events that commenced in New York and concluded with the arrest of defendant and two accomplices in Massachusetts. Although the jury found defendant guilty of both conspiracy in the second degree and attempted criminal possession of a controlled substance in the first degree, on appeal defendant challenges New York’s exercise of territorial jurisdiction over the latter offense only.
 

 Evidence was adduced that the leader of the conspiracy was Salvatore Lombardi, a resident of Brooklyn, and that other participants included Rita Bologna, Michael Booth, Joseph Viola and defendant. Through wiretap surveillance of the telephone line to Lombardi’s residence in January 1992, law enforcement authorities discovered that Lombardi was raising $120,000 to pay a courier fee to obtain a large quantity of heroin. Lombardi’s intercepted conversations cryptically identified the various players in the proposed heroin exchange, including defendant — a pharmacologist referred to as “the professor.” The People theorized that defendant’s role in the enterprise was to test the purity of the heroin.
 

 On January 20, 1992, Lombardi and another individual discussed defendant’s availability for a “contract” Lombardi wished to assign him and, upon receiving a telephone call
 
 *615
 
 advising that defendant had been located, Lombardi summoned defendant to his home. Thereafter, Bologna used Lombardi’s telephone to make airline reservations for three men to fly at 8:00 p.m. that evening to Boston, all under the surname “Coppolecchia.” Law enforcement authorities observed defendant, Booth and Viola board the flight and, at the request of New York investigators, Massachusetts State Troopers followed the activities of the three men once they arrived in Boston. After registering at the airport’s Hilton Hotel under aliases, they were seen entering and leaving each other’s rooms during the next 24 hours.
 

 Using wiretap surveillance, authorities learned that Lombardi telephoned a woman in Florida from his Brooklyn residence at 7:25 a.m. on January 21 and informed her that he was departing to perform a “fast * * * up and down job” in Boston but planned to return home before dinner. Bologna also placed a call from the Lombardi residence, indicating she was taking a day trip but could not divulge the reason for the excursion.
 

 From his home in Brooklyn, Lombardi then telephoned Viola in Boston and inquired whether the men had made contact with the drug courier. When Viola stated the connection had not yet been accomplished, Lombardi asserted that he would “page” the individual himself and indicated he was bringing “the thing” to Boston that day, a reference which the People maintained was to the $120,000 cornier fee.
 

 Later that day, Lombardi arrived in Boston with Bologna and met with the men at the hotel, remaining a total of 15 to 20 minutes. Undercover officers saw Bologna in the lobby restaurant during this time interval. As he departed Booth’s hotel room, Lombardi was overheard commenting that he expected to be home at about 9:00 p.m. that night.
 

 At 9:30 p.m., Lombardi paged Special Agent Ganem, an undercover officer with the United States Drug Enforcement Agency, who was posing as the Lebanese drug courier with whom the group was negotiating the heroin exchange. Ganem returned Lombardi’s call using the telephone number displayed on his pager, which was the number for a Brooklyn restaurant that Lombardi frequented. During this conversation, Lombardi directed Ganem to contact Viola at the Hilton to arrange the sale, indicating Viola was registered at the hotel under the name of “Frank Coppolecchia.” Ganem did as he was instructed and, in the course of his conversation with Viola, agreed to call him in the morning to arrange the meeting. Viola also
 
 *616
 
 expressed a need to change hotels. Hence, at 10:40 a.m. the following morning, Viola, Booth and defendant checked out of the Hilton and registered as guests at a nearby Ramada Inn. Ganem and Viola scheduled the heroin exchange for 12:30 p.m. that day at the Ramada Inn.
 

 New York law enforcement officers recorded a telephone conversation via the wiretap of Lombardi’s Brooklyn residence at 11:18 a.m. on January 22 in which Viola advised Lombardi of the time and location of the meeting. Lombardi directed Viola to call him after the exchange and indicated that all he needed to say was: “I’m on my way home.” Less than an hour later, wearing a transmitting device, Ganem met Viola in the lobby of the Ramada Inn and the two men proceeded to Viola’s room. Telling Ganem to wait for him, Viola went to defendant’s room, retrieved a green and red paper bag, and returned to Ganem to display the contents of the bag — $120,000 in cash. Ganem then retrieved the drugs from a vehicle in the parking lot, returning immediately to Viola’s room where he exhibited several packages containing, in the aggregate, approximately 3.5 kilograms (more than seven pounds) of heroin. Viola declared his intent to return to New York that night with the heroin, hoping that he and Ganem could “do a lot of dealing” in the future. Indicating the drugs would be sold in New York City directly to narcotics users, Viola suggested he and his “friends” were in a position to buy as much heroin as Ganem’s contacts could supply.
 

 Viola removed small samples of the drugs from each package and left with the money and the samples, claiming he would return after the purity of the heroin had been tested. A few minutes later, Viola reappeared, visibly upset, announcing to Ganem that he had seen someone suspicious in the hotel stairwell. At trial, one of the plainclothes officers involved in the Boston surveillance effort testified that he accidentally encountered Viola in the stairwell.
 

 After receiving assurances from Ganem that he had not been accompanied by anyone, Viola again left his hotel room and went to defendant’s room, which was located on a different floor of the hotel. About 20 minutes later, Viola rejoined Ganem and terminated the deal on the basis that the heroin had been tested but was of insufficient purity. He referred to two tests that had been performed, an acid and a burn or “temperature” test, claiming the narcotic had failed both. Although the transaction was cancelled, Viola told Ganem he would call him later that evening from New York.
 

 
 *617
 
 Soon, thereafter, defendant, Booth and Viola checked out of the hotel and boarded a courtesy van destined for the airport. When they alighted at an airport terminal, they were arrested. Defendant was carrying $80,000 in cash; Booth and Viola had $20,000 each. In addition, Booth was found in possession of an electric burner, coffee pot, thermometer, copper wire and other materials that could be used to test the purity of heroin. Two containers of mineral oil of a type that could be used for heroin testing were found in the hotel room vacated by defendant.
 

 Criminal proceedings were commenced against Lombardi, Bologna, Booth, Viola and defendant in New York Supreme Court. Each of his codefendants pleaded guilty, but defendant proceeded to a jury trial. In addition to evidence of the events articulated above, the People admitted portions of Booth’s plea allocution in which he acknowledged that, had the events gone as planned, the heroin was to be transported to New York City.
 

 In response to defendant’s pre-trial assertion that the prosecution was acting in excess of this State’s territorial jurisdiction under CPL 20.20, the People relied on three provisions of the statute, CPL 20.20 (1) (a), 20.20 (2) (b) and 20.20 (2) (c), to establish jurisdictional authority.
 
 *
 
 Consistent with
 
 People v McLaughlin
 
 (80 NY2d 466), these bases for jurisdiction were submitted to the jury, which was directed that defendant could be convicted only if the People established jurisdiction beyond a reasonable doubt. As evidenced by a verdict sheet which defendant challenges on appeal, the jury found defendant was properly prosecuted in New York under each of the People’s theories, and convicted him of conspiracy in the second degree and attempted criminal possession of a controlled substance in the first degree. The Appellate Division affirmed the conviction, as do we.
 

 Historically, under the common law, the only State that could exercise jurisdiction over a felony offense was the State where the felony was completed (see,
 
 People v Werhlow,
 
 241 NY 55, 60). Recognizing this common-law territorial principle as the foundation of our jurisprudence, we have acknowledged that it “has been supplanted by State statutes broadening the territorial scope of criminal jurisdiction”
 
 (People v Stokes,
 
 88 NY2d 618, 624). In New York, the relevant statute is CPL 20.20 which has generally codified the rule “that, for the State to
 
 *618
 
 have criminal jurisdiction, either the alleged conduct or some consequence of it must have occurred within the State”
 
 (People v McLaughlin, supra,
 
 80 NY2d, at 471).
 

 In this case, we must venture beyond this basic articulation of the statute to construe its particular terms, beginning with the People’s first theory of jurisdiction predicated on CPL 20.20 (1) (a), which provides that
 

 “a person may be convicted in the criminal courts of this state of an offense defined by the laws of this state, committed either by his own conduct or by the conduct of another for which he is legally accountable pursuant to section 20.00 of the penal law, when:
 

 “1. Conduct occurred within this state sufficient to establish:
 

 “(a) An element of such offense.”
 

 Interpreting this provision in
 
 People v Stokes,
 
 we held that New York properly exercised jurisdiction over a felony murder prosecution where the death occurred in New York but the underlying felony was committed in Connecticut, reasoning that the death of a nonparticipant in the robbery constituted an element of the offense. Under
 
 Stokes,
 
 it is clear that our analysis must begin with a review of the elements of the offense at issue — attempted criminal possession of a controlled substance in the first degree.
 

 Under Penal Law § 110.00, “[a] person is guilty of an attempt to commit a crime when, with intent to commit a crime, he [or she] engages in conduct which tends to effect the commission of such crime.” We have construed this provision as requiring proof that defendant engaged in conduct that came “dangerously near” commission of the completed crime
 
 (see, People v Acosta,
 
 80 NY2d 665, 670;
 
 People v Mahboubian,
 
 74 NY2d 174, 191;
 
 People v Warren,
 
 66 NY2d 831, 832). A person is guilty of criminal possession of a controlled substance in the first degree when he or she knowingly and unlawfully possesses four or more ounces of a narcotic drug
 
 (see,
 
 Penal Law § 220.21 [1]). Reading these statutes in tandem, the People were obliged to establish that defendant and his accomplices intended to obtain a quantity of heroin exceeding four ounces and that they came very near accomplishing this objective.
 

 In
 
 People v Acosta,
 
 we held that “a person who arranges for the delivery of drugs and actually examines them has come
 
 *619
 
 sufficiently close to the completed crime to qualify as an attempt” (su
 
 pra,
 
 80 NY2d, at 671). Similar to the facts in
 
 Acosta,
 
 the jury credited proof in this case that defendant and his accomplices had sufficient funds to pay the $120,000 courier fee necessary to acquire the more than seven pounds of heroin, and that they had been presented with and examined this quantity of narcotics before declining to complete the transaction due to the alleged inferior quality of the heroin. Accordingly, there is no doubt that, had the events occurred entirely within the State of New York, the People offered sufficient evidence to support defendant’s conviction of the attempted possession offense.
 

 The issue under CPL 20.20 (1) (a) is whether the People established that defendant and his accomplices engaged in conduct
 
 within New York
 
 sufficient to establish an element of attempted criminal possession of a controlled substance as required by the statute. The People argue this jurisdictional predicate was met by the offer of proof of conduct in New York which manifested an intent to commit the crime. In particular, the People rely on evidence that the plan to purchase the drugs was formed in New York City by New York residents who intended to immediately return to this State so the heroin could be sold to narcotics users in New York City. The actions taken in New York which manifested this intent included collecting the $120,000 courier fee necessary to complete the transaction, soliciting defendant to accompany Booth and Viola to Boston, making travel arrangements for defendant, Viola and Booth to meet the courier in Boston, and Lombardi’s continuing and repeated efforts in New York to direct the activities both of Ganem and of defendant and the other accomplices during their sojourn in Boston. This proof went beyond mere thoughts or plans which would not meet the provision’s “conduct” requirement; rather, the People’s intent evidence was in the form of concrete actions of the participants toward accomphshing the purchase of drugs with the intent to possess them in New York. As such, we find the People offered sufficient proof of conduct within New York establishing an element of the attempted possession offense, namely defendants’ intent to possess more than four ounces of a narcotic drug for eventual sale in New York.
 

 Defendant contends, relying on
 
 People v Cullen
 
 (50 NY2d 168), that any manifestations of intent that preceded the moment when Viola and Ganem were in the hotel room with both the money and the heroin planning to complete the transaction
 
 *620
 
 are irrelevant because the
 
 mens rea
 
 and
 
 actus reus
 
 elements of the offense must be present simultaneously. Asserting that the People failed to demonstrate any manifestations of intent in New York at that precise moment, defendant maintains New York was without jurisdiction to prosecute the offense. We disagree.
 

 We take issue with defendant’s premise that there was a lack of proof of simultaneous
 
 mens rea
 
 in New York (intent to possess heroin in New York) and
 
 actus reus
 
 in Boston (the meeting in the hotel room with all of the components necessary to complete the possession offense). Under New York’s concept of accomplice liability, any defendant possessing the requisite mental state is chargeable with the conduct of an accomplice (see, Penal Law § 20.00) and, pursuant to the plain language of CPL 20.20 (1) (a), jurisdiction over all defendants may be predicated on the conduct of an accomplice within New York. Defendant and the other accomplices may, therefore, be held criminally liable for Lombardi’s conduct in New York which, within the hour preceding the meeting, included contacting Viola and directing the actions of the participants. There is no basis to conclude Lombardi abandoned the criminal enterprise before Ganem and Viola met in the hotel room — in fact, he arranged with Viola to receive a call after the exchange. Thus, we conclude that the People offered proof from which the jury could infer that the
 
 mens rea
 
 and
 
 actus reus
 
 elements essential to the crime of attempted possession co-existed in both jurisdictions, providing a basis for prosecution in New York.
 

 Defendant’s reliance on
 
 Cullen
 
 is misplaced because none of the individuals held criminally accountable in
 
 Cullen
 
 were present in the prosecuting jurisdiction when the offense was consummated. In addition,
 
 Cullen
 
 stands for the proposition that a defendant does not manifest the knowledge element necessary for criminal possession of a controlled substance until he or she takes possession of the narcotic. This holding does not necessarily apply to an attempt offense which requires proof of a different
 
 mens rea
 
 — the intent to accomplish a criminal objective. Here, proof was offered that defendants engaged in substantial conduct in New York that manifested an intent to obtain heroin and return with it to New York. Standing alone, this conduct did not rise to a level sufficient to support criminal prosecution for attempted possession of a controlled substance because defendants’ conduct did not constitute an attempt until the meeting in the Boston hotel room when defendants’ conduct came “dangerously near” criminal posses
 
 *621
 
 sion of heroin (see,
 
 People v Acosta, supra,
 
 80 NY2d 665). Nonetheless, the conduct committed in New York evidenced defendant’s intent sufficiently to establish the jurisdictional predicate underlying the prosecution under the CPL 20.20 (1) (a) element requirement.
 

 This conclusion is consistent with
 
 People v Guidice
 
 where, interpreting a provision which contains language identical to that in CPL 20.20 (1) (a), we held that venue was established in New York County over the prosecution of all codefendants involved in an assault that occurred elsewhere based on evidence that one of the defendants formulated the intent to commit assault in New York County, having directed the activities of others from that location (83 NY2d 630, 636). Defendant urges us not to rely on
 
 Guidice
 
 because it involved venue rather than territorial jurisdiction. We acknowledge that it is clear from comparison of the venue and territorial jurisdiction statutes that the Legislature intended venue to extend more broadly than territorial jurisdiction
 
 (compare
 
 CPL 20.20
 
 with
 
 20.40;
 
 see, People v McLaughlin, supra,
 
 80 NY2d, at 471 [“The distinct conceptual differences between venue and territorial jurisdiction and their different jurisprudential purposes make it virtually impossible to equate the two”]). Recognition of distinctions between the statutes as a whole, however, does not necessarily compel that we interpret identical language in discrete provisions differently. While our review in this case does not rest entirely on
 
 Guidice,
 
 this precedent construing the plain language of the “element” requirement common to both statutes lends additional support to our conclusion that defendant’s jurisdictional claim lacks merit.
 

 In sum, we find that the People offered evidence from which the jury could reasonably infer that the CPL 20.20 (1) (a) “element” requirement was met beyond a reasonable doubt, thereby establishing a basis for prosecution in New York. In view of this holding, we need not address whether the exercise of jurisdiction was also proper under CPL 20.20 (2) (b) or (2) (c) — the other two theories submitted to the jury.
 

 Defendant’s remaining argument, that reversal is warranted due to the submission of a written verdict sheet which mirrored the statutory text of the People’s jurisdictional theories, is not properly before us for review. Although defendant objected to the trial court’s failure to include in the verdict sheet an additional jurisdictional theory not proffered by the People — a contention he has abandoned — he waived the claim asserted on appeal by explicitly consenting at trial to the use of
 
 *622
 
 the verdict sheet procedure
 
 (see generally, People v Angelo,
 
 88 NY2d 217, 224).
 

 Accordingly, the order of the Appellate Division should be affirmed.
 

 Chief Judge Kaye and Judges Smith, Levine, Ciparick, Wesley and Rosenblatt concur.
 

 Order affirmed.
 

 *
 

 Because the People expressly declined to rely on CPL 20.20 (1) (c), we have no occasion to address whether it was applicable in this case.